The case for argument is Fish v. Schwab. We're ready to hear from the appellant. Thank you. Good morning, your honors. And if I could, I'd like to reserve four minutes for rebuttal. Your time is your own. You'll have to watch the clock. If you could pull the mic up, that will help. Thank you. Citizenship in the state of Kansas is a qualification to vote. Prior to the injunction in this litigation, Kansas enforced that qualification by way of documentary proof of citizenship. Because that law is neither unconstitutional nor in violation of the NBRA, we ask this court to reverse the judgment at the district court. I'd like to first move to what we would call the Crawford decision or the Crawford issue, the equal protection claim, and talk about a couple of things. First is under the Anderson verdict test, as the court knows, there's an inquiry as to whether or not there's an undue burden and what the state's interests are. We believe that the state's interest in the Crawford decision have been fully enforced, fully identified, and are at least as important in this case as it was in that. As I mentioned to start this argument off, the state has an interest in qualification for eligibility to vote, and so this documentary proof of citizenship furthers that interest. What the district court's decision, as I read it, indicated is that the burden on the particular set of individuals who attempted to register was undue. We believe that decision is contrary to this court's decision, and I believe it's Santelani's, as well as the Supreme Court's decision in Crawford. Well, is it burden on voters generally or the named plaintiffs? So there are two issues there, Your Honor. First is we don't believe that the named plaintiff in the equal protection claim has standing, but if you broaden it to look at the other individuals that were addressed at court, the burden as shown in district court and as the facts found by the district court indicate that the burden even on them was nothing more than incidental, that there has been no proof in the record that they were unable to provide the documentary proof of citizenship. Rather, as Justice Stevens mentioned in the Crawford decision, it was just a normal incidence of getting the documents together. Well, is Crawford all that helpful? I mean, I appreciate that it's a split decision, but it seems Scalia's opinion even also acknowledges the burden balancing that you've described. So we have that basic tenet, but then it seems the case all goes away at the next level, which is the factual failing in that record to prove anything, that there was a burden. And that's really, it seemed, what the Supreme Court got down to in its decision, which is not our case here. We have a factual record developed. We do have a factual record, unlike in Crawford, and what we believe the strength of this case is, the factual record actually shows, and I believe the district court found, decided in a reply brief, I believe it's at 11457, there's no evidence as to how many canceled and suspended applicants in fact lacked documentary proof of citizenship. And so that's the important factual finding in this case, whereas the Supreme Court in Crawford had to assume that we just don't know what the record is. In this case, we actually have a finding. There is no evidence as to what that burden is. The district court mentioned following that indication, there are at least three different reasons why someone may not have had documentary proof of citizenship. In order to overturn a state's law, there has to be evidence that this actually has an undue burden, and people were precluded from providing that documentary proof of citizenship. And that's why we believe the Crawford decision is so important, because Crawford said that providing a photographic ID was not an undue burden, which was free. But in order to get that documentary, or I'm sorry, the photographic identification, you had to provide a primary document. That's what documentary proof of citizenship is. So this is, the Crawford was somewhat of a two-step process. Here there's only one step of providing the documentary proof of citizenship. Just as in Crawford, the plaintiffs have failed to meet that same burden, even after given an opportunity for trial and an opportunity to present that to the court. And the court found there was no evidence. And so we believe that Crawford is very important to that case. Well, I think isn't the point here, is there a basis for the state to impose that burden? I mean, there's statements in this briefing that says the state's authority to ask for qualifications is unfettered. That's sort of broad, isn't it? Well, I think as an incidence of sovereignty, states have a right, the Supreme Court has recognized for decades, to go back to set those qualifications. But not unfettered. Not unfettered. There are certainly limitations, but those limitations aren't even close to being breached here. As the court in the Anderson-Burdick line of cases has indicated, all laws at some level inhibit voting at some level. But, you know, for example, moving the time in which the votes must be counted from 8 p.m. to 7 p.m. Any number of regulatory actions are going to, at some level, restrict the ability to vote. And what inference can we draw in terms of burden, that you had 30,000 people who were suspended or canceled under Kansas' regime? Isn't that number, I think, is right? It is. And so, I mean, that is, and there's evidence in the records that indicate that essentially 99% of those people were citizens. What inference, as it relates to the burden that's imposed upon people, do you derive from the fact that people who are citizens were not registered to vote by virtue of this, what could be deemed to be an obstacle to them being able to do so? Yeah, I think that's a very important point, but I believe it cuts in the favor of the state of Kansas. The 30,000 was roughly 12% of those who attempted to register under the motor-voter provision. So that indicates that 88% of those who have attempted to vote were able to successfully provide the documentary proof of citizenship. Nearly 9 out of 10 individuals. If you look at the 12%, that 30,000 figure you had, that's where the district court finding is important because there's been no evidence that of those people who attempted to register through the motor-voter provision were incapable of providing the documentary proof of citizenship. You're talking about motor-voter provisions as it relates to the constitutional claim, am I right? We're not, but about 75% of that 30,000 figure is a motor-voter. And so what I was indicating is Parker Bednizik is a perfect example of the burden that is allegedly placed here. Mr. Bednizik had a birth certificate, provided it to the United States Navy when he wanted in their Naval Academy, could have obtained it when he went to go register, but chose not to because he politically disagreed. As the court's cases indicate, political disagreement or policy obligations are not what's important here. What's important is whether the burden is undue. And the evidence in this case, as consistent with Crawford and Santilli's, there's a Seventh Circuit decision, I believe it's Frank B. Walker, the Judge Easterbrook decision, also found that a similar burden does not violate Crawford and is not an undue burden. And so we think the evidence is in the state's favor in this regard because there is no evidence of an undue burden. What is the equal protection implication of, from a burden point of view, of the unequal application of the DBOC rule as it relates to the people who were registered before 1990, what was it, 1991? And the people after that. When did DBOC go in? 2011, I believe. Sorry. No, no, no, you're fine. So I think what you're getting at is the people who were registered on that particular date didn't have to show documentary proof of citizenship. And they will never, ever have to show. Right. But then going forward, they would have to. I think that's what you're talking about. That is my point. Absolutely. So first of all, as the Help America Vote Act indicates, you can't remove someone who's already registered. So the state of Kansas, if it intended to remove them, would be precluded by the Help America Vote Act. And the second thing that this court's decision to incentivize is that states don't have to grab the entire problem and solve it with one fell swoop. They can take a particular portion and apply it going forward. Because as the birth rates and the eligibility come up, eventually everyone is going to have to. They had to pick a date certain, and then going forward, they would eventually get full compliance with that. So I don't believe that there are any indications that there is a particularized class of individuals that this affected more than the other. Anyone and everyone registered on 2011 continues to be registered. Only those new registrants, regardless of the class that they may fall in, always have to provide documentary proof of citizenship. And I'm not sure. Thank you. So that's why we believe that the Crawford decision is the important one. Let me understand something. Sure. And when you read the Dictionary of the Border, you had a mixture of both the perceived burden of imposing a DPOC requirement by the fact of the imposition of it, the fact of the 90-day clock on solving the problem. But then there was a lot of talk about just bureaucratic ineptitude and the fact that people were told that they were registered when they weren't. The idea that essentially the implementation of this resulted in people being, in the one case of the professor, being so disheartened by the whole process that he didn't try to register when he could have. What role does that play in sort of a Crawford burden analysis? In other words, apart from sort of the literal terms of how the law is implied, the literal terms of what the law says you have to do, as opposed to sort of the bureaucratic ineptitude of the implementation of the law. Yeah. And again, I think Crawford talks to that. So there are at least two levels that we're dealing with here. The macro level, which is kind of what we've been talking about, and then the more micro granular level that you're talking about, the implementation of how it's applied at the, for example, the motor vehicles or something like that. And so those are things that are certainly concerning. But those get into, as the Crawford case indicates, no system is going to be perfect and no implementation is going to be perfect. And in fact, I think it was either Husted or Crawford that indicated that, you know, the state's own negligence at some level is responsible for some of the problems the state's trying to to get. And so the rollout is problematic and concerning and should be improved. But that's not a reason in and of itself to undermine the entire law and strike it all down as unconstitutional. But that's what I want to get at. I mean, as a legal proposition, if you have a law that imposes one could argue just the necessary attendant associated burdens of voting, you know, the Crawford language. That's not it. But that, you know, if you had a provision that did that, but then it was implemented in such an arbitrary, incompetent fashion that you resulted in disenfranchising a bunch of voters, that must have some constitutional import, doesn't it? Well, so if it were on a widespread scale, as well, it is a widespread scale, but it's not. The professor that you indicated is a one off issue. There was another person who was told that they were registered and that they weren't. So I think there are three. The evidence of the trial indicates that there are, I think, three people that had that issue. And those are instances in which the application to them is problematic. And the remedy for how you handle that is something different than striking down the entire law. As we saw in the I think we cited the Seventh Circuit cases, the Ketterle decision and something else. There are problems all over, even when you're applying the motor voter provision. These problems are going to happen no matter what, because the system in and of itself is a human issue. The problems that you're identifying aren't documentary proof of citizenship specific problems. It happened to be in this application. That's what those that's how it arose. But it doesn't mean that the entire voter registration system in the state of Kansas is unconstitutional and disenfranchises. For example, college professors that can't get their votes count. So we don't see it as a class wide issue. We see it more as an individual as a big issue. Yeah. For an individual who actually isn't a litigant in this case, or at least in that portion of the case. And I see I have a minute. I'd like to keep talking. Thank you. May it please the court. The judgment below should be affirmed for two principal reasons. First, like you're showing at the preliminary injunction phase, the defendant's evidentiary submissions at trial fell well short of the showing necessary to rebut the presumption that section five of the N.V.R.A. preempts the Kansas documentary proof of citizenship requirement as to motor voter applicants. Second, with respect to the constitutional claim, the district court's extensive and uncontested factual findings confirmed with this court preliminarily determined that the Kansas law had caused a mass denial of a fundamental constitutional right. Under the Anderson verdict balancing test that compels careful scrutiny of the state's interests under which the Kansas law cannot survive. That is only if that burden is beyond whatever that language is in Crawford, that incidental burden associated with voting. Right. It is only if it goes beyond that threshold that you're supposed to give this careful scrutiny that you're alluding to. Right. That's correct. Judge Holmes and the district court. Is that the case? The district court found that it was for four principal reasons. First, unlike in Crawford, where it was impossible to quantify the magnitude of the number of voters affected here, we know from the state's own records that 30,732 voters took the affirmative step of trying to register to vote, but were blocked solely because of the D.P.O.C. requirement. And as counsel raises, there is a there is a significant issue and apparently factual gap as to whether those people, whether it would have been very, very easy for them to bring their D.P.O.C. They just chose not to. Well, here's what we do know, Your Honor, is that of that 30,000 or so people, 16,000 of them applied and had their registrations canceled altogether. They would have been registered, but for the D.P.O.C. requirement and of the 14,000 or so whose applications were merely suspended. The district court found that about 30 percent of voters eventually submitted documentary proof of citizenship, but of people who were suspended over 70 percent didn't. So we know that the vast majority of voters who are affected by this law don't ultimately become registered to vote. And we had testimony from a number of people who were disenfranchised during the 2014 midterms. That's true. But the question is, what does that tell us? I mean, what does it tell us about what the reason for that is? I mean, if they if they just decide, well, you know, man, it's a hassle and I'm just not going to do this. You know, they didn't take me the first time. I'm not doing it. We're talking out of the 70 percent that you were talking about. Well, I mean, why isn't that, you know, a usual burden of voting? And if you just aren't willing to do that, too bad. Well, what I would say, Judge Holmes, is that it's not a usual burden of voting. This law is really unique. Kansas is the only state in the country that requires a citizenship document for voter registration. And the result was one of our clients, Donna Bucci, couldn't afford a birth certificate. She was disenfranchised in 2014. Another one of our clients, Wayne Fish. I'm sorry, Judge Holmes. Another one of our clients, Wayne Fish. It took him two years to find his birth certificate. And he was also disenfranchised in the interim. And either one of those are plaintiffs in the constitutional claim that you have divorced, right? Both of them applied to register to vote at the DMV and their claims were resolved under the preemption claim under the National Voter Registration Act. They were, I remember them, but they are not clients in the constitutional claim. That's right, Your Honor. But I think their experiences are still relevant in assessing the constitutional claim. What the Supreme Court said in Crawford was that when assessing the burden, courts have to look at the character and magnitude of the burden on the right to vote. And that inquiry, I think, necessarily requires a look beyond the experiences of the individual plaintiffs. Because, after all, you can't quantify the impact of a law just by looking at the one or two plaintiffs who bring a case. You can't. But do the individual plaintiffs have to share the burden that you are implicating? In other words, there's a magnitude issue where you say, OK, the named plaintiff here, he suffered X burden. And then you're going to say, well, I want to extrapolate to all these people who aren't named plaintiffs but say they also suffered that burden. That's one thing. It's another thing to have the named plaintiff who did not suffer X burden. And then you're going to say, I want you to facially declare this to be invalid because all of those other nameless people out there who are not named plaintiffs did suffer that burden. Did you? Was I clear on that? I'm saying that's a distinction with a difference, isn't it? I think so, Judge Holmes. But I would say two things in response to that. The first is that, as this court instructed in Santillanes, the New Mexico ID case, standing is not a proxy for merits. A plaintiff can have standing to challenge a law. But the question about whether or not the law imposes an undue burden isn't identical to the issue of whether or not the plaintiff has standing. And there, the court found that the plaintiffs had standing simply because they had to show a form of ID, regardless of whether or not they had it or not. And the undue burden analysis, I think, proceeded based on an analysis of the effect of the law generally. The plaintiffs in Crawford, for example, couldn't identify a single person who was disenfranchised by the law. And yet the court looked to the whole record of the impact of the law in assessing whether or not it imposed an undue burden. So I think the experiences of the law generally would be relevant here. OK. And they'd be relevant on the merits as you define it, right? Yes, I think that's right, Judge Holmes. Well, going on the standing question, is there a standing problem that the main plaintiff does not share the burdens, these other burdens that you're alluding to, beyond the notion of having to actually produce DPOC, which he says he won't do? I mean, is there a problem for his standing purposes when he's trying to raise a facial constitutional claim that he doesn't have all these burdens that you allude to as being the parade of horribles that other people have? I don't think he has a standing problem because, again, standing is not a proxy for the merits. But it's an issue, so go to talk about the standing issue. Sure. This court in Santianus held that the plaintiffs had standing simply because they had to show ID in order to vote, whereas other people didn't. Now, that's also the case here. Some people, like Mr. Bipnozik, have to show proof of citizenship to become registered to vote, while others do not. The 11th Circuit in Common Cause v. Billups held that the plaintiffs— Other plaintiffs do not? Are you talking about people who were registered prior to 2011? I'm talking about those people and also people who received, the district court found, some kind of selective favorable treatment from the Secretary of State's office, either by being walked through a hearing process that permitted them to register to vote without DPOC, or some people who actually never showed DPOC at all had their registrations canceled under the 90-day period. And yet, somehow, these were the plaintiffs in this case and in some plaintiffs in some state court litigation, still somehow found themselves registered to vote, which the district court, in her partial summary judgment ruling, determined did not occur through the ordinary course of business. In Kansas, it looked like there was a sort of strategic practice of picking off plaintiffs to avoid adjudication of the final merits here. And I think that speaks to the uneven, inconsistent application of this law, which is a problem, and another thing that distinguishes this case from Crawford, where there was a single burden applied evenly to everyone. Okay, but I take it that on the standing front, your point is simply that because the main plaintiff here had a DPOC burden, and that that was sufficient and it was impacted by not producing that DPOC, that was sufficient to give him standing. Yes, that is… Is he standing to raise a facial constitutional claim? Yes, that's right. And just so that the record is clear, Judge Holmes, he didn't have the documentary proof of citizenship in his possession at the time that he was registered to vote. But he could have gotten it? He could have, but as the 11th Circuit held in Common Cause versus Phillips, the plaintiffs there who lacked ID, it didn't really matter in the court's analysis of standing whether or not they could, quote, easily obtain ID. The point was they didn't have it, and that satisfied the de minimis injury necessary to have standing. And as to the fact that this was a facial challenge, the claim here isn't a challenge to a particular application of this statute or a challenge as it affects a particular subclass of voters. It really is a challenge to the widespread burdens which the court found. One out of eight voter registration applicants blocked from registering to vote under this law across a wide range of circumstances. Some people who couldn't afford or couldn't locate their DPOC. Other people who actually provided their DPOC, Professor Boynton, to whom you alluded earlier, and also another one of our clients, Charles Stricker, they weren't notified that they hadn't been registered to vote under this law until they got to the polls during the 2014 midterm when it was too late. And I think that's another distinction between this case and Crawford, because there the court found that any burdens imposed by the Indiana voter identification requirement were mitigated by the presence of a post-election safety valve that allowed voters who lacked ID to vote and have their ballots counted. The provisional ballot ID. Precisely. And there's no such safeguard here that functions effectively, the district courts have found. Talk to me, please, about whether there's a distinction or a difference between the burden of a DPOC requirement, period, and the implementation of a DPOC regime. Because there's a lot of talk in the district court's opinion about how these individuals that you identified, your clients who aren't named clients here, but those individuals that you identified, were harmed by what seems to be, at one level, the bureaucratic ineptitude of Kansas in how they implemented this system. Because in one instance, I think in the Stricker case, didn't they have DPOC? Well, he presented it at the time, but he... He presented it until he had it, and so it's not a question that he hadn't fulfilled the requirement, it's just that they were incompetent in allowing that to happen. If you're talking about striking down a statute, and you're saying a regulatory regime statute, and the regulation that goes with it, to what extent do we look at the burden that exists just by the act itself, by the act that the statute requires you to do, and to what extent do we look at the burden that's associated with the administrative machinery to implement that? Judge Holmes, I think the court has to look at the whole record of... I would imagine somebody's trying to give me some constitutional basis for that. Well, I guess what I would say to that, Judge Holmes, is that the record in this case was five years of that kind of inconsistent treatment. It continued even after there were agreements in place between the Secretary of State's office and the Department of Vehicles, and also the Kansas Department of Health and Education to get Kansas birth certificates. It persisted even after this court affirmed the district court's preliminary injunction and necessitated contempt finding by the district court, which the defendant has chosen to abandon his appeal of. So I think what the record here shows is that the difficulties of implementing a law like this, which again is unique in the country, are baked into the statute. Is it possible that there could be some other documentary proof of citizenship requirement that had an adequate safety net, that didn't impose these kinds of burdens and was implemented adequately? It's conceivable, Your Honor, but I can't see this law and this record satisfying that kind of requirement. Well, we have the discussion of the safety net, the subsection M, the opportunity for a hearing. Yes, Judge Briscoe. Is that a safety net? Well, the district court found that it didn't, that over the years only five or maybe six Kansans had ever taken advantage of that, and the evidence about how that hearing process worked in practice only in the district court's view underscored how burdensome it was. The lone witness who had participated in that hearing, Jo French, who testified at trial, she testified that it took her five months to satisfy the hearing process. She had to pay $8 to the state of Arkansas to confirm that her birth certificate didn't exist, something that she already knew. She had to rely on friends to collect high school and baptismal certificates. She eventually became, I guess, a friend, in her words, of the deputy secretary of state and made a round trip of, I think, 40 miles to attend a 30-minute hearing. It really, I think, shows just how inadequate a safety net that supposedly is. So we don't have the provisional ballot opportunity here, right? Well, people can cast a provisional ballot, Judge Briscoe, it just won't be counted. So it's not like the Indiana provisional ballot safety network. So if these individuals come to the poll and the poll worker says, I'm sorry, your name isn't on the list, they're given a provisional ballot, and then that's when the 90 days kicks in? The 90 days kicks in at the time of their registration application. And I guess the exception to that would be if you register within 90 days of the election because you can't come back after the election and show your birth certificate and have your ballot counted. That's really, I think, the critical distinction between here and Indiana. In fact, in Indiana, you didn't even have to show ID during the seven-day cure period. You could just return and say, yes, I am who I said I was on election day. Right, right, right. But the provisional ballot that is an opportunity here under the Kansas law, how does that play out then? It really is kind of a paper safety net. It doesn't really do anything. It would never be counted because you're not registered, period. Correct. I thought you said it would work if you had registered within 90 days of the election. You go to the election and they reject you. You go and you can get a DPOC. Then your ballot would count. I'm sorry, Judge Holmes. I may have misspoken. I don't believe that that's the case. You have to be fully registered before election day in order to have your ballot counted. So it would have no effect. That's right. And that's precisely why this provisional ballot option isn't really much of one here in Kansas. If I could conclude on one point, Your Honors. The defendant's position in this case is really that the state has almost unfettered discretion. My adversary has said that he doesn't believe it's totally unfettered, but he hasn't articulated any kind of limit on the documentation requirements that a state can impose upon voter registration applicants. The record, in his view, is irrelevant. It wouldn't matter if it were 30,000 or 300,000 people who had been blocked under this law. And that can't be squared with this court's ruling on the preliminary injunction, and it can't be squared with the Supreme Court's guidance that the burden under the Anderson-Burdick balancing test, however slight, must be justified by sufficiently weighty state interests. Thank you. Thank you, Counsel. Your Honors, I have three points that I'd like to make quickly. First, Judge Holmes, with regard to the grandfather issue, the district court considered and rejected that. That's no longer a part of the case. Second thing, with regard to voter apathy, for those who attempt to register but never bring back, I think you mentioned never choose to bring back, I believe it's their expert, Dr. Richardson, at Joint Appendix page 9081-82 that talks about that's a known phenomenon among social scientists, that any type of burden, you're just going to lose some people. The third thing I would make is in the Santellanis case of this court, it cited a Ninth Circuit decision that says that under the Anderson-Burdick test, an even-handed apolitical statute is almost by definition going to satisfy that. Can I add to that? No, go ahead. I'll just grab a quick second. Sure. What is the relationship between these two lawsuits? In other words, just work with me for a second. If we're to lose on the constitutional claim, is there any reason we need to reach the motor voter fish litigation? Are they connected? Because the constitutional claim covers everybody in Kansas. The motor voter case only covers the motor voter people. They're brought by separate groups of plaintiffs, so would we still have to reach both? The answer to that is tricky, and it's complicated because there are additional lawsuits. I noticed that we didn't include in our prior and related appeals two state court matters, what we call Brown-Belenky. The Appellee's brief did mention those. So that has to do with whether or not if the NVRA portion goes against us and we win on the equal protection, then we can have effectively two forms, state and federal. And so I guess if the court struck down the statute on the constitutional provision, I'm working my way through your question here, I think the answer is you don't need to get to the NVRA, I think. But I would want to think through that a little more. So I don't think we would be able to enforce it. Constitutional issues do not equate to preemption issues, is that what you're saying? I think they may preclude us in both state and federal elections if it is determined a new burden. In other words, registering in a state election, if it was determined to be an undue burden, I think so. Yeah, I mean, I would think that if we struck down, and maybe the safest thing is to read the book, but I would think that if we struck down on constitutional grounds, that covers everybody in Kansas, the burden as it relates to Kansas voters, and so the fact that the voter-voter preemption issue would just seem not to matter anymore. But again, we'll get back to that. But it's such a great issue. Yes, of course. We're hopeful we went on both, so. Yeah, yeah. Thank you, Your Honor. Thank you. Thank you both for presenting your arguments this morning. The court will be in a brief recess. We will take 15 minutes when we return. We will hear arguments in Schott v. Huff.